1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

EMMAUEL SALINAS, on behalf of himself
and the Class Members,

              Plaintiff,

      v.

NESTLÉ PURINA PETCARE COMPANY,

              Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: 1:21-cv-01140 JLT CDB

ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

(Doc. 51)

       Emmanuel Salinas asserts Nestlé Purina PetCare Company failed to comply with wage and hour laws arising under the California Labor Code, California Business & Professions Code, and Fair Labor Standards Act. (*See generally* Doc. 50.) Salinas seeks preliminary approval of the settlement reached in this action. Specifically, Salinas seeks: (1) conditional certification of the proposed settlement class, (2) preliminary approval of the settlement terms, including approval of an FLSA Collective; (3) appointment as the class representative; (4) appointment of the firm of Schneider Wallace Cottrell Konecky LLP as class counsel; (5) preliminary approval of the request for attorneys' fees and costs; (6) approval of the class notice; (7) appointment of the settlement administrator; and (8) scheduling for final approval. (Doc. 51.) For the following reasons, the motion for preliminary approval of the settlement is **DENIED**.

///

## I.     Background

Salinas began working for Nestlé Purina PetCare Company in February 2015, and is currently employed as a forklift operator in Maricopa, California.  (Doc. 50 at 4, ¶ 13.)  He reports his "primary duties" involve moving products within a warehouse "in a safe and efficient manner by forklift operation and physically uploading/unloading [the] trucks."  (*Id.*)  Salinas "is also responsible for maintaining proper inventory, good housekeeping, and upholding warehouse standards."  (*Id.*)  Salinas asserts he is classified as an hourly, non-exempt employee and is paid an hourly rate of $25.46."  (*Id.*)  He reports that "Nestlé Purina employs hundreds of hourly, non-exempt workers similarly situated to Plaintiff in California."  (*Id.*, ¶ 12.)

Salinas alleges Nestlé Purina "routinely requires" employees "to perform substantial work off-the-clock and without compensation."  (Doc. 50 at 4, ¶ 16.)  According to Salinas, "prior to clocking in for the start of [a] shift," he and the putative class members were required "to wait in line, to go through temperature checks and to answer COVID-19 screening questionnaires."  (*Id.*)  Salinas asserts it takes "several minutes to go through the line, to undergo such temperature checks, and to answer the COVID-19 screening questionnaires," and this time "goes unrecorded and therefore uncompensated." (*Id.*)  Salinas asserts Nestlé Purina also requires donning and doffing personal protective equipment "before the shift and after their shift, *i.e.*, before clocking in and after clocking out."  (*Id.* at 4-5, ¶ 17, emphasis omitted.)  He reports that even if employees clock in early and then don the protective equipment, Nestlé Purina "still does not compensate them until the actual starting time of their scheduled shift."  (*Id.* at 5, ¶ 17.)  Consequently, Salinas contends the "time spent donning and doffing also goes unrecorded and therefore uncompensated."  (*Id.*)  He asserts that Nestlé Purina applies these COVID-19 and "donning and doffing" practices "across all [of its] facilities throughout California." (*Id.* at 5-6, ¶ 22.)

In addition, Salinas alleges that Nestlé Purina "engaged in a policy and/or practice of rounding time worked."  (Doc. 50 at 5, ¶ 19.)  He asserts Nestlé Purina "implemented a policy and/or practice until approximately August 2022 of requiring [Salinas] and putative Class members to arrive and clock in for work 15 minutes in advance of their start times, but automatically rounded up such clock in times to … [their] start times for purposes of pay."  (*Id.*)  Salinas contends "this rounding policy

1   *and/or practice resulted in the underpayment of wages….*"  (*Id.*)

2       He contends Nestlé Purina also "regularly fail to provide … complaint meal breaks."  (Doc. 50

3   at 6, ¶ 24.)  Salinas alleges Nestlé Purina "routinely denied meal breaks" because: (1) the company

4   "does not authorize, permit, and/or make available timely and full off-duty meal breaks" and (2) the

5   employees "are often too busy with work during the day to have time to take bona fide meal breaks."

6   (*Id.*, ¶ 25.)  Salinas asserts:

7           When Plaintiff and putative Class members do attempt a meal break, such
            are untimely and/or shortened, i.e., after the end of the fifth hour of work
8           and/or less than thirty minutes. As a result, Plaintiff and Class members
            are not provided duty-free, uninterrupted, and timely thirty- minute meal
9           periods during which they should be completely relieved of any duty, by
            the end of the fifth hour of work.

10          Further, for each day Plaintiff and putative Class members work shifts of
11          more than ten hours, Defendants systematically deny Plaintiff and putative
            Class members a second meal break. Similarly, Plaintiff and putative
12          Class members do not receive requisite timely and full premium payments
            at the regular rate for these missed second meal breaks.

13

14  (*Id.*, ¶¶ 26-27.)  He asserts that on "the rare occasions" when Nestlé Purina paid the premium

15  payments, they were "not paid timely or at Plaintiff's and Class members' regular rate of pay."  (*Id.*, ¶

16  24.)  Similarly, he contends Nestlé Purina does not "provide[] the timely, full, and required rest breaks

17  required by California law," and "fails to make the full, required premium pay at the employee's

18  regular rate."  (*Id.* at 6-7, ¶ 28.)  Salinas asserts Nestlé Purina applies these meal and rest breaks

19  policies at all of its facilities in California.  (*Id.* at 7, ¶ 29.)

20      According to Salinas, Nestlé Purina suffered "a breach that affected the Kronos payroll system

21  between approximately December 2021 to April 2021 that [Nestlé Purina] used to record hours and

22  wages." (Doc. 50 at 5, ¶ 18.)  Salinas contends that as a result of the breach, he and the putative class

23  members were underpaid, and Nestlé Purina "failed to timely and accurately issue its employees—

24  including Salinas and the putative class—the correct payment for the hours of work that they have

25  labored.  (*Id.*)  Salinas asserts the wage statements were inaccurate as they "do not include payment for

26  all hours worked, including minimum wages and overtime, and premium pay for missed meal breaks."

27  (*Id.* at 7, ¶ 31.)

28      Further, Salinas contends that Nestlé Purina "failed to pay all owed wages to departing putative

Class members within the time limits imposed by Labor Code §§ 201-203." (Doc. 50 at 20, ¶ 101; *see also id.* at 7, ¶ 32.)

On July 26, 2021, Salinas initiated this action by filing a complaint against Nestlé Purina and Nestlé USA, Inc. alleging violations under California wage and hour laws on behalf of a putative California Class. (Doc. 1.) He also filed a complaint against Nestlé Purina PetCare Company and Nestlé USA, Inc. in Alameda Superior Court, Case No. 21CV000112.[1,2] (Doc. 51-1 at 6-7, Cottrell Decl. ¶ 9.) In the state action, Salinas "alleged claims under the Private Attorneys' General Act, Cal. Lab. Code §§ 2698." (Doc. 50 at 12-13.)

The Court issued a Scheduling Order governing the action—including any briefing on a motion for class certification—on May 4, 2022. (Doc. 30.) The parties engaged in discovery, including both an informal exchange of information and propounding written discovery requests. (Doc. 51 at 13.) Salinas reports that Nestlé Purina "produced over 4,240 documents, which include a 20% sampling of contact information, pay records, and time records for putative Class members; general policies; and job descriptions." (*Id.*) In addition, he asserts Nestlé Purina "provided class-wide figures, including the total number of putative Class members, separated putative Class members, putative Class members who signed a $1,500 release …, as well as their associated workweeks and pay periods." (*Id.*)

On April 19, 2022, the parties participated in a mediation session with Scott Slater Markus. (Doc. 51 at 14, citing Cottrell Decl. ¶ 15 [Doc 51-1 at 7].) After the mediation was unsuccessful, the parties continued with discovery and Nestlé Purina pursed individual settlements with putative class members, obtaining 54 individual "releases of all claims in this Action along with a Section 1542 waiver, in exchange for $1,500 minus taxes and other wage withholdings." (*Id.*)

---

[1] Although counsel identified the case number of the state action as 21CV0012, this appears to be a typographical error. The Court's review of the docket of the Alameda Superior Court identifies *Salinas v. Nestle Purina PetCare Company, et al.*, as Case No. 21CV000112.

[2] The Court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993). The accuracy of the official records of Alameda Superior Court—as contained on the court's official website—cannot be questioned, and judicial notice may be taken of the court docket. *See Porter v. Ollison*, 620 F.3d 952, 954-55 (9th Cir. 2010) (observing "it is proper to take judicial notice" of "any state court dockets"); *see also Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank,* 136 F.3d 1360, 1364 (9th Cir. 1998) (taking judicial notice of court filings in a related state court case). Accordingly, the Court takes judicial notice of the docket of Case No. 21CV000112, including the complaint filing date and dismissal documents.

On November 4, 2022, the parties participated in a second mediation session, with mediator Deborah Crandall Saxe.  (Doc. 51 at 14.)  Although the action did not settle that day, the parties later accepted the mediator's proposal "and executed a memorandum of understanding regarding the major terms" on December 5, 2022.  (*Id.*, citing Cottrell Decl. ¶¶ 17-18 [Doc. 51-1 at 8].)  After this agreement, the parties engaged in additional discovery, including "the contact information of putative Class members, exemplars and documents regarding putative Class members who were paid salaries but classified by Defendant as non-exempt, and the Rule 30(b)(6) deposition of Chord Fonvielle, the Human Resources Manager for Defendant's Maricopa, California facility."  (*Id.*)

The parties filed a stipulation with this Court, reporting: "pursuant to the Parties' agreement, the Parties agreed that Plaintiff would file a stipulation… for an order granting [him] leave to amend the operative complaint to add factual allegations and California PAGA claims for the alleged violations of California labor laws asserted in the PAGA Action, to facilitate the settlement of this Action and the PAGA action."  (Doc. 48 at 2.)  In addition, Salinas indicated he intended to add an FLSA claim and "other allegations agreed to be settled."  (*Id.* at 3.)  The Court approved the stipulation, after which Salinas filed his First Amended Complaint.  (Docs. 49, 50.)

In the FAC, Salinas identified the following causes of action against Nestlé Purina[3]: (1) failure to pay all hours worked in violation of Cal. Lab. Code § 204; (2) failure to pay minimum wages in violation of Cal. Lab. Code §§ 1182.11, 1182.12, 1194, 1197, and 1197.1; (3) failure to pay overtime wages in violation of Cal. Lab. Code § 510; (4) failure to authorize and permit meal and rest periods in violation of Cal. Lab. Code §§ 226.7 and 512; (5) failure to provide timely and accurate itemized wage statements in violation of Cal. Lab. Code § 226; (6) failure to provide timely pay to departed employees in violation of Cal. Lab. Code §§201-203; (7) unlawful business practices, in violation of Cal. Bus. & Prof. Code §§ 17200 *et. seq.*; (8) penalties pursuant to Section 2699(a) of the Private Attorney Generals Act; (9) penalties pursuant to Section 2699(f) of the Private Attorneys General Act; and (10) violations of the Fair Labor Standards Act.  (Doc. 50 at 1; *see also id.* at 11-27.)

The parties executed the "Joint Stipulation of Settlement and Release" on March 27, 2023.

---

[3] Based upon the stipulation of the parties, the Court dismissed Nestlé USA, Inc., as a defendant prior to the filing of the FAC.  (Docs. 31, 32.)

1  (Doc. 51-1 at 24-54.)  The same date, the parties stipulated to dismiss the state court action due to the

2  pending settlement, including the filing of the FAC.  The Alameda Superior Court approved the

3  stipulation and dismissed the complaint without prejudice.  Salinas now seeks approval of the

4  settlement terms.  (Doc. 51.)  Nestlé Purina did not oppose or otherwise respond to the motion.[4]

5  **II.    The Proposed Settlement**

6          Pursuant to the "Joint Stipulation of Settlement and Release" ("the Settlement"), the parties

7  agree to a gross settlement amount of $3,000,000.00 for the class including: "[a]ll persons employed by

8  Defendant in a Job Position at any time during the Class Period."  (Doc. 51-1 at 29-30 §§ III-IV.)  The

9  Settlement defines a "Job Position" as "any non-exempt hourly or non-exempt salaried California job

10  position" with Nestlé Purina, and the "Class Period" runs from January 29, 2017 through February 5,

11  2023.  (*Id.* at 28, § II(4), (10).)  Thus, the Settlement Class includes all persons employed by Nestlé

12  Purina in the state of California in any non-exempt hourly or non-exempt salaried position from

13  January 29, 2017 through February 5, 2023.

14          In addition, the Settlement includes an escalator clause, under which the gross settlement

15  amount nay be increased.  (Doc. 51-1 at 30.)  The parties agreed the Settlement amount was "based on

16  approximately 25,075 pay periods for Settlement Class Members from January 29, 2017 through

17  November 4, 2022."  (*Id.*)  Pursuant to the Settlement, "If it is determined that the number of pay

18  periods for Settlement Class Members between January 29, 2017 and the end of the Class Period

19  exceeds 29,583, the Maximum Settlement Amount will be increased by the same number of percentage

20  points above ten percent (10%) by which the actual number of pay periods exceeds 25,075."  (*Id.*)  For

21  example, if the actual number of pay periods in the Class Period totals 29,583—which is approximately

22  18% higher than 25,075— the settlement amount would be increased by 8%.  (*Id.*)

23          Nestlé Purina agrees to pay the settlement amount to the Settlement Administrator after final

24  approval of the Settlement and judgment.  (Doc. 51-1 at 28, § III(8); *id.* at 38, § X.)

25  ///

26

27  [4] The Settlement indicated: "the Parties agree that Plaintiff and Defendant will *jointly* request that the District Court enter the Preliminary Approval Order."  (Doc. 51-1 at 44, § XV [emphasis added].)  However, the "Notice of Motion" clearly

28  indicates that "Salinas… moves the Court for preliminary approval of the Joint Stipulation of Settlement."  (Doc. 51 at 2.) As a result, Nestlé Purina had an opportunity to oppose the motion, as provided in Local Rule 230(c).

### A.      Payment Terms

The "Maximum Settlement Amount" will cover payments to class members with additional compensation to Salinas as the class representative.  (Doc. 51-1 at 30, §§ IV-V.)  In addition, the Settlement provides for payments to Class Counsel for attorneys' fees and expenses, to the Settlement Administrator, and the California Labor & Workforce Development Agency.  (*Id.*)  Specifically, the Settlement provides for the following payments from the gross settlement amount:

- The Class Representative will receive an enhancement fee up to $7,500;

- Class counsel will receive up to $1,050,000 for attorneys' fees, which equals 35% of the gross settlement, and actual costs up to $30,000;

- The California Labor and Workforce Development Agency shall receive $75,000 from the total PAGA payment of $100,000; and

- The Settlement Administrator will receive up to $10,050 for fees and expenses.

(*Id.* at 29-34, §§ V-VIII.)  After these payments, the remaining money ("Net Settlement Amount") — which is currently estimated to be $1,802,450— will be distributed to class members.  (*Id.*; *see also* Doc. 51 at 16.)  If the Court approves payments that are less than the amounts designated above for the class representative or counsel, the money will not revert to Nestlé Purina.  (Doc. 51-1 at 31-32, §§ V-VI.)  Instead, the funds will instead be retained in the Net Settlement Amount and distributed to Class Members.  (*Id.*)

Class members are not required to submit a claim to receive a share from the Net Settlement Amount.  (*See* Doc. 51-1 at 56 [proposed notice informing the class members that "[t]o receive a settlement check under the Settlement, you need not take any action"]; *id.* at 61 ["You are not required to take any action to receive a check"].)  Class members' shares will be distributed on a pro rata basis, with two allocation amounts based upon the number of pay periods worked during the relevant period.  (*Id.* at 34, § IX(2).)  The Settlement provides:

> [E]ach Participating Class Member shall receive a "First Pro Rata Allocation Amount" and a "Second Pro Rata Allocation Amount." The combined payments of the First Pro Rata Allocation Amount and Second Pro Rata Allocation Amount to be paid to each Participating Class Member is such Participating Class Member's "Class Member Allocation Amount." The *pro rata* payments for the First and Second Pro Rata Allocation Amounts shall be calculated as follows:

7

a.      A preliminary *pro rata* share, the First Pro Rata Allocation Amount, will be calculated for each Participating Class Member as follows: (i) the number of pay periods each respective Participating Class Member worked in a Job Position during the Class Period; divided by (ii) the aggregate number of pay periods worked by all Participating Class Members in a Job Position during the Class Period; then multiplied by (iii) the Net Settlement Amount, and (iv) if applicable, then subtracting $1,500. Certain Settlement Class Members signed releases solicited by Defendant in exchange for a payment of One Thousand Five Hundred Dollars and No Cents ($1,500.00) each. For such Participating Class Member who signed such a release, step (iv) in this subparagraph (a) will be performed. If after performing step (iv) in this subparagraph (a), such a Participating Class Member has a preliminary pro rata calculation of $0 or less, Such Participating Class Member's First Pro Rata Allocation Amount shall be $0.

b.      A second preliminary *pro rata* share, the Second Pro Rata Allocation Amount, will be calculated for each Participating Class Member as follows: (i) the number of pay periods each respective Participating Class Member worked in a Job Position during the Class Period; divided by (ii) the aggregate number of pay periods worked by all Participating Class Members in a Job Position during the Class Period; and then multiplied by (iii) the Net Settlement Amount less the total First Pro Rata Allocation Amount calculated for all Participating Class Members pursuant to subparagraph (a) above.

(Doc. 51-1 at 34-35, § IX(2).)  Further, the Settlement indicates that individuals shall receive PAGA payments—whether or not participating class members—based upon the number of pay periods worked.  (*Id.* at 35, § IX(3).)  The "Individual PAGA Payment" will be calculated as follows:

(a) the number of pay periods each PAGA Employee worked in a Job Position during the PAGA Period; divided by (b) the aggregate number of pay periods worked by all PAGA Employees in a Job Position during the PAGA Period; and then multiplied by (c) the PAGA Portion.

(*Id.*)  Thus, the exact amount settlement class members receives depends upon how long they worked for Nestlé Purina, and whether they are entitled to a portion allocated for the release of PAGA claims. Salinas reports that if the Court approves of the proposed payments from the gross fund—including the maximum attorney fees and class representative enhancement award under the Settlement—the average settlement payment is expected to be $13,071.  (Doc. 50 at 26.)

The appointed Settlement Administrator will distribute payments by mailing checks to all Participating Class Members and PAGA Employees.  (*See* Doc. 51-1 at 37, § IX(11).)  Checks must be cashed within 180 days of the mailing.  (*Id.*, § IX(10).)  If any check remains uncashed after the 180-period, the money does not revert to Nestlé Purina.  (*Id.*)  Rather, "the Settlement Administrator shall

8

stop payment on such check and remit the funds to the Unclaimed Property Fund maintained by the State Controller's Office in the name of the Participating Class Member and/or PAGA Employee who failed to cash his or her check." (*Id.*)

**B.     Releases**

The Settlement provides that Salinas and class members, other than those who elect not to participate in the Settlement, release Nestlé Purina and Nestle USA, Inc.[5] from claims arising in the relevant period.  Specifically, the release for Class Members provides:

> As of the Effective Date, each Participating Class Member hereby fully, finally, and forever releases and discharges each and every one of the Released Parties from all claims, demands, rights, liabilities, and causes of action arising in whole or in part, for any of the following arising from employment by Defendant during the Class Period: (a) any alleged or actual failure to provide proper, accurate, timely, adequately descriptive, or complete wage statements or pay stubs; any alleged or actual failure to timely, properly, or fully or completely pay, or any alleged or actual failure to properly calculate, any wages including but not limited to any minimum wages, regular wages, overtime premium wages, or meal or rest period premium wages; any alleged or actual failure to comply with meal or rest period requirements or requirements for recording meal or rest periods or work hours; any actual or alleged failure to timely pay all wages or compensation owed to a fired, quitting, or otherwise departing employee; or any alleged or actual failure to pay any interest or penalties owed as a result of any of the foregoing; or (b) in any manner arising out of any of the other facts or legal theories alleged or asserted in: (i) the original complaints in the Action or PAGA Action or in the Amended Complaint to be filed under this Settlement, including, but not limited to, claims arising under or out of any unfair competition laws as defined in California Business and Professions Code Section 17200 et seq., and claims for declaratory or injunctive relief or for monetary compensation, whether in the form of wages, damages, liquidated damages, penalties, restitution, costs, attorneys' fees, interest, or otherwise; or (ii) Plaintiff's PAGA letters to the LWDA, including the amended PAGA Letter to be sent under this Settlement (the "Released Class Claims").

(Doc. 51-1 at 38-39, § XII.)

---

[5] The Settlement defines "Released Parties" as including: "(a) Defendant Nestle Purina PetCare Co. and each and all past or present partners, parents, subsidiaries, or affiliates (regardless whether such partners, parents, subsidiaries, or affiliates are individuals, corporations, partnerships, limited partnerships, limited liability companies, or other forms of entity) of Nestle Purina PetCare Co., including but not limited to Nestle USA, Inc.; (b) each and all of the predecessor or successor entities of any of those entities identified in subparagraph (a); (c) any other individuals or entities of any kind, including but not limited to any payroll companies, which have been or could be alleged to be in any manner responsible (whether on an alter ego, joint employer, integrated enterprise, or any other theory) for any violations described in the "Released Claims" (defined below) and occurring as a result of employment by Defendant; and (d) all past and present directors, officers, representatives, insurers, agents, shareholders, limited or general partners, members, lawyers, and employees of any of the individuals or entities identified in subparagraphs (a), (b), or (c)."  (Doc. 51-1, § II(20).)

9

1      The Settlement provides that by cashing the payment check, class members opt-in to the FLSA

2 collective and release those claims:

3        Participating Class Members who cash, deposit, or otherwise negotiate checks or otherwise obtain the proceeds for their Class Member Allocation

4        Amount shall be deemed to have opted into a collective action under the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA"), and to have

5        released each of the Released Parties from any and all claims, penalties, costs, expenses, attorneys' fees, liabilities, damages, and actions or causes

6        of action of whatever kind or nature under the FLSA, known and unknown, which derive from any of the foregoing Released Class Claims.

7        Checks to Participating Class Members shall include a notation that the cashing of the checks constitutes such an opt-in and effectuates these

8        FLSA releases.

9 (Doc. 51-1 at 39, § VII.)

10      In addition, the Settlement provide a release for "PAGA Employees," which includes class

11 members—including those who request exclusion from the Settlement— employed in a relevant job

12 position from January 29, 2020 through February 5, 2023 ("the PAGA Period"). (Doc. 51-1 at 28, §

13 II(15); *id.* at 34 § VIII.) The Settlement provides:

14        As of the Effective Date, each PAGA Employee hereby fully, finally, and forever releases and discharges each and every one of the Released

15        Parties on behalf of the LWDA from all Labor Code or Wage Order violations under the PAGA, arising in whole or in part, during the PAGA

16        Period, which in any manner which (a) derive from any of the foregoing Released Class Claims; or (b) are or could have been alleged or asserted

17        under the PAGA in: (i) the original complaints in the Action or PAGA Action, or in the Amended Complaint to be filed pursuant to this

18        Settlement; or (ii) Plaintiff's PAGA letters to the LWDA, including the amended PAGA Letter to be sent under this Settlement (the "Released

19        PAGA Claims").

20 (*Id.* at 39-40, § XII.) There is no right to request exclusion from the Released PAGA Claims. (*Id.*)

21      The "Released Class Claims" and "Released PAGA Claims" defined above are collectively the

22 "Released Claims" under the Settlement. (Doc. 51-1 at 40, § XII.) The Settlement provides that

23 Participating Class Members and PAGA Employees, "upon the Effective Date, shall be deemed to

24 have, and by operation of the Final Class Judgment in the Action shall have, fully, finally, and forever

25 settled and released any and all Released Claims known or unknown, suspected or unsuspected,

26 described above." (*Id.*) The releases in the Settlement are full and complete, even if "different or

27 additional facts" from those known at this time are discovered in the future. (*Id.*)

28      The release for Salinas encompasses more than those identified for class members, because he

agreed to release claims that could have arisen during the course of his employment with Nestlé Purina, not just those claims constrained to the facts alleged in the FAC.  (Doc. 51-1 at 40-41, § XIII.)  The Settlement indicates:

> In partial consideration for the Class Representative Enhancement Fee and other benefits under this Joint Stipulation of Settlement, Plaintiff provides the following additional releases: as of the Effective Date, Plaintiff shall fully, finally, and forever release and discharge each and every one of the Released Parties from all claims, demands, rights, liabilities, and causes of action of every nature and description whatsoever, whether known or unknown, whether sounding in tort, in contract, in law, in equity or otherwise, and including but not limited to all claims for violation of any local, state, or federal statute, rule, or regulation, which Plaintiff now has, owns, or holds, or claims to have, own, or hold, or which he ever had, owned or held, whether known or unknown, suspected or unsuspected, at any time prior to the date he executes this Joint Stipulation of Settlement (collectively "Plaintiff's Released Claims").

(*Id.*)  Thus, the claims released by Salinas—but not class members— include any claims for violations of Title VII of the Civil Rights Act, fraud, promises without intent to perform, breach of contract, breach of the implied covenant of good faith and fair dealing, wrongful termination, retaliatory discharge, negligent or intentional infliction of emotional distress, misrepresentation, and violations of California's Fair Employment and Housing Act.  (*See id.*) However, the Settlement also provides:

> Plaintiff's Released Claims do not include the release of claims as prohibited by law, the Fair Credit Reporting Act, the Older Workers Benefit Protection Act, the Worker Adjustment and Retraining Notification Act, the Family and Medical Leave Act, the Sarbanes-Oxley Act of 2002, the Uniformed Services Employment and Reemployment Rights Act, as well as claims Plaintiff may have for: (a) unemployment, state disability and/or paid family leave insurance benefits pursuant to the terms of applicable law; (b) workers' compensation insurance benefits pursuant to applicable state law under the terms of any workers' compensation insurance policy or fund; (c) continued participation in Defendant's group medical benefits plans, if any, at Plaintiff's own expense pursuant to the terms and conditions of the federal law known as "COBRA" and/or any applicable state law counterpart; (d) benefits, to which Plaintiff would be entitled under any Released Parties' benefit plan subject to the provisions of the Employee Retirement Income Security Act of 1974 otherwise known as "ERISA" in which they participated during their employment with Defendant, such as any pension plans; (e) violation of any federal, state, or local statutory and/or public policy right or entitlement that, by applicable law, is not waivable; and (f) any wrongful act or omission occurring after the Effective Date.

(*Id.* at 42.)  Nevertheless, Salinas indicates that his release is intended to be "a full and complete release to the maximum extent allowed by law except for the limited express exclusions above."  (*Id.*)

### C.      Objections and Opt-Out Procedure

The proposed "Notice of Class Action and PAGA Representative Action Settlement" explains to class members: "You are not required to take any action to receive a check."  (Doc. 51-1 at 61.)  However, any class member who wishes may file objections or request exclusion from the Settlement.  (*Id.* at 45-47, § XVI.)

Individuals who wish to be excluded from the Settlement Class must submit a written "Opt-Out Letter" or "Request for Exclusion" to the Settlement Administrator within 15 days of the Notice post-marked date.  (*Id.* at 46.)  To be deemed proper, an exclusion must:

> (1) make the following statement or a similar statement: "I wish to exclude myself from the settlement reached in the matter of Salinas v. Nestlé Purina PetCare Company. I understand that, by excluding myself, I will not receive any money (other than the Individual PAGA Amount [if applicable]) from the settlement reached in this matter"; (2) contain the name, address, and the last four digits of the Social Security number of the person requesting exclusion; (3) be signed by the Settlement Class Member; and (4) be postmarked or fax stamped by the Deadline Date and returned to the Settlement Administrator at the specified address or fax telephone number stated in the Class Notice.

(*Id.*, § XVI(A)(4).)  However, such a request does not exclude an individual from the PAGA release.  (*Id.* at 46-47; s*ee also id.* at 40, § XII.)

Class members may also object to the settlement terms by mailing a written statement to the Settlement Administrator.  (Doc. 51-1 at 47-48, § XVI(B)(1).)  A proper objection must:

> (1) contain the name, address, and the last four digits of the Social Security number of the objector; (2) set forth the legal and factual grounds for the objections; and (3) be signed by the Settlement Class Member;. Such written objections should be mailed and postmarked on or before the Deadline Date, or within fifteen (15) calendar days after the postmark of a Class Notice re-mailed to a corrected address for that Settlement Class Member or the Deadline Date, whichever is later.

(*Id.*)  The proposed notice also explains these requirements.  (*Id.* at 56, 61-62.)

### III.     Preliminary Approval of a Class Settlement

When parties settle the action prior to class certification, the Court has an obligation to "peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Preliminary approval of a class settlement is generally a two-step process.  First, the Court must assess whether a class exists.  *Id.*

1  (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).  Second, the Court must "determine

2  whether the proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v.*

3  *Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is

4  within the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

### A. Conditional Certification of a Settlement Class

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf

of all."  Fed. R. Civ. P. 23(a).  Salinas seeks certification of a Settlement Class defined as: "all persons

employed by Defendant in any non-exempt hourly or non-exempt salaried California job position at

any time during the time period from and including January 29, 2017, through and including February

5, 2023."  (Doc. 51 at 17, *see also* Doc. 51-1 at 28-30 §§ II(4), II(10), III-IV.)

### 1. Rule 23(a) Requirements

Parties seeking class certification bear the burden of demonstrating the elements of Rule 23(a)

are satisfied, and "must affirmatively demonstrate … compliance with the Rule."  *Wal-Mart Stores,*

*Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304,

1308 (9th Cir. 1977). The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly

encompassed by the named plaintiff's claims."  *General Telephone Co. of the Southwest. v. Falcon*,

457 U.S. 147, 155-56 (1982).  Certification of a class is proper if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class; (3) the claims
> or defenses of the representative parties are typical of the claims or
> defenses of the class; and (4) the representative parties will fairly and
> adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  These prerequisites are generally referred to as numerosity, commonality,

typicality, and adequacy of representation.  *Falcon*, 457 U.S. at 156.

### 2. Numerosity

This prerequisite requires the Court to consider "specific facts of each case and imposes no

absolute limitations."  *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Although there is

not a specific threshold, joining more than one hundred plaintiffs is impracticable.  *See Immigrant*

*Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002)

1  (finding the requirement "satisfied solely on the basis of the number of ascertained class members");

2  *see also Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1332 n.7 (9th Cir. 1977) (a

3  proposed class with 110 members "clearly [included] a sufficient number to meet the numerosity

4  requirements").  Salinas reports, "there are approximately 146 putative Class members who are readily

5  identified from Defendant's payroll records."  (Doc. 51 at 21.)  Therefore, the joinder of all identified

6  as plaintiffs is impracticable, and the numerosity requirement is satisfied.

7  <u>3.    Commonality</u>

8  Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

9  To satisfy the commonality requirement, the plaintiff must demonstrate common points of facts and

10  law.  *See Wal-Mart Stores*, 564 U.S. at 350.  Thus, "commonality requires that the class members'

11  claims depend upon a common contention such that determination of its truth or falsity will resolve an

12  issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the

13  capacity of classwide proceedings to generate common answers to common questions of law or fact

14  that are apt to drive the resolution of the litigation."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581,

15  588 (9th Cir. 2012) (internal quotation marks, citations omitted).

16  Salinas asserts the commonality requirement is satisfied because Nestlé Purina "has uniform

17  policies applicable to all Class members."  (Doc. 51 at 21.)  Salinas contends such policies—and

18  common facts—include:

19  the requirement that all non-exempt employees use the Kronos timekeeping
20  system, Defendant's policy of paying 30 minutes each day for meal breaks,
   Defendant's failure to track meal periods until April 2021, Defendant's
21  policy of COVID-19 checks following March 2020, Defendant's policy of
   requiring employees to use written time sheets during the Kronos breach in
   late 2021 to early 2022, Defendant's policy that employees don PPE, and
22  Defendant's policy of not providing off-duty meal periods or rest breaks.

23  (*Id.*, citing Cottrell Decl.¶ 35 [Doc. 51-1 at 13].)  In addition, Salinas identifies the following legal

24  issues as common to the class:

25  whether Defendant's practice prior to August 2022, of not paying
   employees for undergoing COVID-19 checks and donning PPE among
26  other job duties, was improper; whether Defendant's failure to track meal
   breaks until April 2021 was improper; whether Defendant provided
27  compliant meal and rest breaks; and whether Defendant's payment of 30
   minutes each day were sufficient to satisfy Defendant's meal and rest
28  break violations.

14

(*Id.*)  Because it appears resolution of the identified issues—such whether Nestlé Purina's practices and policies violated wage and hour laws—apply to the claims of each of the Class Members, the Court finds the commonality requirement is satisfied for purposes of settlement.

### 4.     Typicality

This requirement demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A claim or defense is not required to be identical, but rather "reasonably coextensive" with those of the absent class members.  *Hanlon*, 150 F.3d at 1020.  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks, citation omitted).  Importantly, a named plaintiff does not satisfy the typicality requirement when "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to [him]."  *Id.* (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when named plaintiffs are not subject to unique defenses).

Salinas contends the typicality requirement is satisfied because his "claims are typical of those of all other Class Members."  (Doc. 51 at 22.)  He asserts, "Interviews with putative Class members and review of timekeeping and payroll data further confirm that Plaintiff and other putative Class members were subjected to the same alleged illegal policies and practices to which Plaintiff was subjected."  (*Id.*)  Thus, Salinas concludes that "[t]hey were subject to the alleged illegal policies and practices that form the basis of the claims asserted in this case."  (*Id.*)

Importantly, however, a review of the operative pleading indicates Salinas includes a claim for which he did not suffer any injury and lacks standing.  Salinas asserts that he "is currently employed" by Nestlé Purina, yet his sixth cause of action "on behalf of the class" is for failure "to pay all owed wages" under Labor Code Sections 201-203.  (*See* Doc. 50 at 2 and 20, ¶¶ 4, 100-102 [emphasis omitted].)  Salinas also requested PAGA penalties for the alleged violations of Labor Code Sections 201-203.  (*Id.* at 21, ¶ 107(e).)  To have standing for a claim under either Section 201 or Section 202—

which set deadlines for paying employees unpaid wages after termination or resignation—Salinas must no longer be employed by Nestlé Purina.[6]  *See McDowell v. Penske Truck Leasing Co., L.P.*, 2024 WL 1354261, at *4 (C.D. Cal. Mar. 29, 2024) (finding that where "none of the named plaintiffs resigned or were discharged …at the time that they filed this action, they lack[] standing for their claims under both section 201 and 202").

A plaintiff "must demonstrate standing for each claim []he seeks to press."  *Mays v. Wal-Mart Stores, Inc.*, 804 Fed. App'x 641, 643 (9th Cir. 2020); *see also Hawkins v. Comparet-Cassani,* 251 F.3d 1230, 1238 (9th Cir. 2001) ("A named plaintiff cannot represent a class alleging … claims that the named plaintiff does not have standing to raise").  Salinas fails to meet this requirement with his sixth cause of action, as he did not suffer any injury under Labor Code Sections 201 and 202 and is not entitled to the penalties sought under Section 203.  Because Salinas states a claim on behalf of the class for which he did not personally suffer an injury, it appears Salinas is subject to a unique defense. *See Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216 (1974) (indicating that to be a proper class representative, a plaintiff must "suffer the same injury shared by all members of the class he represents"); *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 235 (C.D. Cal. 2003) ("typicality may not be established unless the named representative has individual standing to raise the legal claims of the class"); *McDowell*, 2024 WL 1354261, at *4 ("a named plaintiff may pursue a claim on behalf of a class only for statutory injuries that he himself suffered").  This issue was not addressed by Salinas—or even acknowledged—and the Court is unable to find at this time that Salinas satisfies the typicality requirement of Rule 23.[7]

---

[6] Moreover, even if his employment ended, Salinas is unable to state a claim under *both* Sections 201 and 202. Section 201 provides that "[i]f an employer *discharges* an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Cal. Lab. Code § 201 (emphasis added).  Section 202 states "[i]f an employee ... *quits* his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter..." Cal. Lab. Code § 202 (emphasis added).  As this Court previously observed, "plaintiff could not have both resigned and been terminated at the same time." *Perez v. DNC Parks & Resorts at Sequoia*, 2020 WL 4344911 *8 (E.D. Cal. July 29, 2020).  Thus, an employee who was *discharged* is unable to state a claim under Section 202, and an employee who *quits* cannot state a claim under Section 201. *See id.; see also Pineda v. Bank of Am., N.A.*, 50 Cal. 4th 1389, 1394 (2010) (explaining Section 202 applies only "to employees who quit"). It follows that a plaintiff who lacks standing under either section is unable to obtain penalties under Cal. Lab. Code § 203 for the failure to comply with the deadlines identified in Sections 201 and 202.

[7] The identified claim was clearly not abandoned, as the Settlement release for class members includes claims for "any actual or alleged failure to timely pay all wages or compensation owed to a fired, quitting, or otherwise departing employee; or any alleged or actual failure to pay any interest or penalties owed as a result of any of the foregoing…" (Doc. 51-1 at 39, § XII.)

5.      Adequate Representation

Absentee class members must be adequately represented for judgment to be binding upon them. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940). Accordingly, this prerequisite is satisfied if the representative party "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

Importantly, when a named plaintiff lacks standing to assert a claim "that may be available and advantageous to the absent putative class members," there is a conflict of interest between the plaintiff and the class. *See In re Stec Inc. Securities Litig., No. 09-1304,* 2012 WL 6965372, at *6 (C.D. Cal. Mar. 7, 2012); *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("named plaintiffs …may not be able to provide adequate representation for those who have suffered different injuries"); William B. Rubenstein, *Newberg on Class Actions* § 3:59 (5th ed. 2011) ("If a court finds that standing is lacking, then adequacy will be as well, for a plaintiff cannot be an adequate representative for claims []he does not have standing to pursue"). Because Salinas lacks standing for all claims he states on behalf of the class, there is a conflict of interest between Salinas and the class. Thus, Salinas fails to demonstrate he satisfies the adequacy requirement.

**B.      Conclusion**

Salinas fails to carry his burden to show the prerequisites of Rule 23(a) are satisfied for the proposed settlement class, and the Court is unable to certify the class. *See Dukes*, 564 U.S. at 350. Accordingly, the Court declines to consider whether the Settlement satisfies the requirements of Rule 23(e)(2) of the Federal Rules of Civil Procedure. *See Staton*, 327 F.3d at 952.

**IV.      The FLSA Collective**[8]

The principal purpose of the Fair Labor Standards Act "was to protect all covered workers from

---

[8] Because the Court finds the Settlement Class may not be certified and declines to approve the Settlement on this basis, it need not evaluate the FLSA Collective. Nevertheless, the Court also takes this opportunity to identify concerns related to settlement of the FLSA claim, which also prevent preliminary approval.

substandard wages and oppressive working hours….” *Barrentine v. Arkansas-Best Freight Sy*s., 450 U.S. 728, 739 (1981).  To accomplish that goal, the FLSA precludes employees from waiving their rights to minimum wage or overtime pay and authorizes employees to bring suit to recover back wages, liquidated damages, and injunctive relief.  *Id.* at 740.  Employees may bring collective actions under the FLSA, representing all “similarly situated” employees, but “each employee [must] opt-in to the suit by filing a consent to sue with the district court.”  *Does I thru XXIII v. Advanced Textile Corp*., 214 F.3d 1058, 1064 (9th Cir. 2000).  Accordingly, when employees settle an FLSA action with their employer, the settlement must be evaluated for fairness and approved by the Court. 29 U.S.C. § 216(b); *see also Barrentine*, 450 U.S. at 740.

The Ninth Circuit has not established criteria for district courts to consider in determining whether an FLSA settlement should be approved.  *See Kerzich v. County of Tuolumne*, 335 F. Supp. 3d 1179, 1184 (E.D. Cal. 2018).  However, Ninth Circuit district courts have applied a widely-used standard adopted by the Eleventh Circuit, which considers whether the settlement is a fair and reasonable resolution of a bona fide dispute.  *Id.*; *see also Lynn’s Food Stores*, *Inc. v. United States*, 679 F.2d 1350, 1352-55 (11th Cir. 1982); *Selk v. Pioneers Mem’l Healthcare Dist*., 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016) (following the Eleventh Circuit’s decision in *Lynn’s Foods*); *Yue Zhou v. Wang’s Restaurant*, 2007 WL 2298046, at *1 (N.D. Cal. Aug. 8, 2007) (same).  “A bona fide dispute exists when there are legitimate questions about the existence and extent of Defendant’s FLSA liability.”  *Selk*, 159 F. Supp. 3d at 1172 (internal quotation marks, citation omitted).

### A.    Inclusion of FLSA claim in the settlement

The “district court must ultimately be satisfied that the settlement’s overall effect is to vindicate, rather than frustrate, the purposes of the FLSA.”  *See Kerzich*, 335 F. Supp. 3d at 1185.  The district court’s role “is not to act as caretaker[,] but as gatekeeper,” to ensure a settlement does not frustrate the purpose of the FSLA.  *Id.* (quoting *Goodwin v. Citywide Home Loans, Inc.*, 2015 WL 12868143, at *2 (C.D. Cal. Nov. 2, 2015).

The purpose of the FLSA may be frustrated where a plaintiff amends his complaint “to add an FLSA claim for purposes of settling it.”  *See Gonzalez v. CoreCivic of Tenn., LLC*, 2018 WL 4388425, at *4-6 (E.D. Cal. Sept. 12, 2018).  In *Gonzalez*, the Court observed at a hearing on the plaintiff’s

motion for preliminary approval that the proposed settlement included a release of FLSA claims, though no such claim was alleged in the initial complaint.  *Id.* at *4.  In response, the plaintiff requested leave "to amend the complaint to add an FLSA claim for the purpose of settling it."  *Id.*  The parties then "lodged a proposed first amended complaint as an exhibit to their amended settlement agreement in which a FLSA claim [was] alleged for the first time."  *Id.*  Thus, the Court noted that "the first reference to FLSA claims in this litigation was in the waiver set forth in the original settlement agreement."  *Id.* at *5. The Court observed that amending a complaint under such circumstances "raises red flags in large part because it appears plaintiff agreed to settle the FLSA claim before he ever considered litigating it."  *Id.* at *4.  The Court explained the "sequence of events raises a substantial concern … that it was defendants who insisted these claims be included as part of this settlement, and [the] plaintiff merely acquiesced to this request because he never intended to litigate the FLSA claims."  *Id.* at *5.  In addition, the "atypical circumstances create a potentially indelible stain for the settlement agreement as drafted, because they point toward collusion between the parties."  *Id.*

Similarly, the first mention of Salinas making an FLSA claim in this action was made *after* the parties notified the Court that they reached a settlement.  The initial complaint filed in this action on July 26, 2021, did not include a claim under the FLSA, and instead included only claims arising under state law.  (*See generally* Doc. 1.)  After engaging in discovery and two mediation sessions, the parties filed a joint report on January 30, 2023, informing the Court that they "executed a term sheet settling this case and the State Action on a class-wide basis." (Doc. 42 at 2.)  The parties indicated: "As part of the settlement, the Parties agreed to dismiss the State Action without prejudice and add the PAGA claims in that action to this action," and Salinas was in the process of "finalizing a stipulation and amended complaint."  (*Id.*)  In a status report the following month, the parties again indicated an amended complaint would be filed "to add the PAGA claims in [the state] action to this Action."  (Doc. 44 at 2.)  On March 22, 2023, the parties filed a stipulation for Salinas to file the FAC, reporting for the first time that the FAC would also include "FLSA claims [and] other allegations agreed to be settled." (Doc. 48 at 3.)  The parties then executed the agreement, which includes provisions for class members to opt-in the FSLA collective action and the release FLSA claims and filed the proposed settlement on March 27, 2023.  (Doc. 51.)  This sequence of events—as in *Gonzalez*—indicates that Salinas agreed to

settle FLSA claims without a prior intent to litigate claims on behalf of a collective.  Without any explanation from Salinas, this agreement casts doubt upon the fairness of the settlement for an FLSA collective.  *See Gonzalez*, 2018 WL 4388425, at*4-6.

  **B.**  **Valuation and payment of the FLSA claim**

  FLSA settlements must comprise "a fair and reasonable resolution of a bona fide dispute." *Kerzich*, 335 F. Supp. 3d at 1184.  A dispute is "bona fide" if there are "legitimate questions" about the existence and extent of a defendant's FLSA liability.  *Id.*; *see also Selk v. Pioneers Mem'l Healthcare Dist.*, 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016).  Importantly, "[a] court will not approve a settlement of an action in which there is certainty that the FLSA entitles plaintiffs to the compensation they seek, because it would shield employers from the full cost of complying with the statute." *Kerzich*, 335 F. Supp. 3d at 1184.  However, if a bona fide dispute between the parties exists, courts will often consider many of the same factors that guide preliminary certification of Rule 23 class actions in evaluating the fairness of the FLSA settlement.  *See Maciel v. Bar 20 Dairy, LLC*, 2018 WL 5291969, at *4 (E.D. Cal. Oct. 23, 2018).

  Notably, "courts that have approved settlements releasing both FLSA and Rule 23 claims generally do so only when the parties expressly allocate settlement payments to FLSA claims." *Anderson v. Safe Streets USA, LLC*, 2022 WL 17821702, at *6 (E.D. Cal. Dec. 20, 2022) (quoting *Thompson v. Costco Wholesale Corp.*, 2017 WL 697895, at *8 (S.D. Cal. Feb. 22, 2017)); *see also Priyanka Khanna v. Intercon Sec. Sys.,* 2014 WL 1379861, at *2 (E.D. Cal. Apr. 8, 2014) (approving a hybrid settlement that allocated two-thirds of net settlement amount to the state claims and one-third of the settlement to FLSA claims).

  Carolyn Cottrell, an attorney for Salinas, reports that counsel determined the value "for unpaid meal and rest premiums and unpaid wages" claims to be $3,625,283.75.  (Doc. 51-1 at 16, Cottrell Decl. ¶ 49.)  She asserts that "[w]hen adding the calculated derivative penalties, this settlement amount represents approximately 61% of Defendant's total potential exposure of $5,050,460.81." (*Id.*)  However, counsel does not identify any specific values for the claims, including the claim under the FLSA.  In addition, counsel does not specify what percentage, if any, of the settlement is for the resolution of the FLSA claims in this action.  (*Id.*; *see also* Doc. 50.)  Without such additional

information, the Court cannot find the release of FLSA claim is "a fair and reasonable resolution" in this action.  *See Gonzalez*, 2018 WL 4388425, at *6 (finding it was "impossible for the court to analyze whether the settlement amount is a fair and reasonable compromise of [the FLSA] claims" where the plaintiff failed to supply "any information about what the potential damages for the FLSA claims are or whether liquidated damages were available"); *see also Maciel v. Bar 20 Dairy, LLC*, 2018 WL 5291969, at *6 (E.D. Cal. Oct. 23, 2018) (a settlement calling "for a release of the FLSA claim in exchange for no consideration does not appear to be a fair and reasonable resolution of a bona fide dispute over FLSA provisions" [internal quotation marks, citation omitted]).  Thus, the lack of information from Salinas regarding the value of the FLSA claim weighs against approval.

### C.     Opt-in procedure

The FLSA requires written consent from members who wish to opt-in to an FLSA collective, stating: "No employee shall be a party plaintiff to any [collective] action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b); *see also Genesis HealthCare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013).  In general, "[c]ourts require a separate opt-in procedure for FLSA claims when the settlement includes both Rule 23 and FLSA claims."  *Brown v. Tetra Tech., Inc.*, 2024 WL 1462764, at *14 (E.D. Cal. Apr. 4, 2024) (citing *Hudson v. Libre Tech., Inc.,* WL 5963648, at *9 (S.D. Cal. Nov. 13, 2019) (collecting authority).

The parties agreed that class members opt-in to the FLSA collective and release those claims by cashing or depositing their payment checks.  (Doc. 51-1 at 39, § VII.)  Specifically, the Settlement indicates:

> Participating Class Members who cash, deposit, or otherwise negotiate checks or otherwise obtain the proceeds for their Class Member Allocation Amount shall be deemed to have opted into a collective action under the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ("FLSA"), and to have released each of the Released Parties from any and all claims, penalties, costs, expenses, attorneys' fees, liabilities, damages, and actions or causes of action of whatever kind or nature under the FLSA, known and unknown, which derive from any of the foregoing Released Class Claims.

(*Id.*)  The parties also agreed: "Checks to Participating Class Members shall include a notation that the cashing of the checks constitutes such an opt-in and effectuates these FLSA releases."  (*Id.*)  However, Salinas does not address how this satisfies the FLSA's requirement of written consent to opt-in to a

collective.  (*See* Doc. 51 at 17, 34.)

Courts have repeatedly determined the cashing of a check to opt-in to an FLSA collective fails to satisfy the FLSA's requirement of written consent.  *See, e.g., Smothers v. Northstar Alarm Servs., LLC,* 2019 WL 280294, at *11 (E.D. Cal. Jan. 22, 2019) (holding the written consent requirement of Section 216(b) was not satisfied where parties proposed FLSA opt-in procedure by endorsing back of check); *Chen v. Western Digital Corp.*, 2020 WL 13587954, at *9 (C.D. Cal. Apr. 3, 2020) ("the check-cashing opt-in mechanism, without more, does not comply with the plain language of the FLSA" [internal quotation marks, citation omitted]); *Johnson v. Quantum Learning Network, Inc.,* 2016 WL 8729941, at *1 (N.D. Cal. Aug. 12, 2016) (finding that a settlement provision allowing FLSA members to opt-in by cashing or depositing settlement checks "does not comply with the plain language of the FLSA" and constitutes a "deficiency" that precluded settlement approval); *Van Kempen v. Matheson Tri-Gas, Inc.,* 2016 WL 4073336, at *9 (N.D. Cal. Aug. 1, 2016) (finding the provision that FLSA class members "opt-in to the class by cashing or depositing their settlement check… violates the FLSA" [internal citation omitted]); *see also Coleman v. Amazon.com, Inc.*, 2023 WL 4408713, at *2 (W.D. Tenn. July 7, 2023) ("Courts have recently and repeatedly refused to endorse settlements that premised the release of FLSA claims merely on the deposit of a check"). Because there is no showing that the cashing or depositing of checks by a class member constitutes proper written consent, the consent mechanism identified in the Settlement fails to comply with the requirements of the FLSA.

## V.    Conclusion and Order

For the reasons set forth above, the Court **ORDERS**: The motion for preliminary approval of the class action settlement (Doc. 51) is **DENIED** without prejudice to a renewed motion addressing the Court's concerns.

IT IS SO ORDERED.

Dated:    **April 19, 2024**

UNITED STATES DISTRICT JUDGE